UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
SPECTRE AIR CAPITAL, LLC                          :

                       Plaintiff,          :          23 Civ. __10929_____

                                 :

    - against -                                          :          **VERIFIED COMPLAINT**

WWTAI AIROPCO II DAC,                             :

                       Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

       Plaintiff Spectre Air Capital, LLC ("Spectre Air" or "Plaintiff"), by and through its attorneys, Smith, Gambrell & Russell, LLP, alleges against defendant WWTAI AIROPCO II DAC, ("Defendant") as follows:

<u>**NATURE OF THE ACTION**</u>

       1.     Plaintiff has a key line of business in which it purchases aged passenger aircraft airframes (without engines), converts them to cargo use, and then sells or leases the cargo aircraft to its customers which include key players in the cargo and logistics industry.  This is a highly technical business requiring the expenditure of thousands of hours of engineering and other work in preparation for the conversion, the purchase of highly technical conversion kits that are unique to each particular aircraft, and the expenditure of millions of dollars to have the conversion kits installed along with all the other work necessary for such a massive transformation.

       2.     Defendant agreed to sell and Plaintiff agreed to purchase five (5) specific A321-200s Airframes pursuant to a binding written purchase agreement.  They were all unique airframes, but two were particularly unique (Manufacturer's Serial Numbers 2553 and 2610) because they had very similar technical attributes and their layout was virtually identical.  This allowed for substantial cost savings not only for the conversions themselves, but for the ultimate operator, as

the required maintenance programs for these two aircraft would be nearly identical making them very valuable to the end user.  In the industry, these are referred to as sister or sistership aircraft.

3.      As the parties neared completion of the sale of the fifth and final airframe by year end, Defendant suddenly tried to get out of the sale in a series of calls from November 8-11.  Defendant indicated that the current lessee for the aircraft wanted to extend the lease for several years, and Defendant ultimately asked whether there was an amount Plaintiff Spectre Air would take to walk away from the purchase.

4.      In response, Plaintiff Spectre Air unequivocally stated that it wanted to proceed with the closing.  Plaintiff Spectre Air also stated that it would be virtually impossible to determine the amount of damages that it and its affiliates would suffer as a result of a cancellation given, among other things, the work that had gone into getting ready for the conversion process, contractual commitments that would have to be broken, and the lost profits and reputational damage that Plaintiff Spectre Air and its affiliates would suffer.

5.      Undeterred, Defendant simply manufactured a false basis to try to stop the sale.  On November 30, 2023, Defendant suddenly sent a notice purporting to terminate the purchase agreement because the original delivery date in the purchase agreement of January 15, 2023, had passed.  **At Defendant's request**, however, the original delivery date had been rescheduled to the end of 2023.  The parties had been working toward the agreed-upon year-end closing including exchanging technical information and discussing delivery locations in September and October of 2023.  There simply was no basis for the purported termination.  It was Defendant's desperate attempt to get out of its obligation to sell the unique airframe because Defendant preferred to extend its current lease with Aegean Airlines.

6.     Plaintiff Spectre Air seeks a temporary restraining order preventing Defendant from leasing or selling the Aircraft to protect Plaintiff Spectre Air's rights to replevin and specific performance of the Purchase Agreement.

## THE PARTIES

A.     **Plaintiff Spectre Air.**

7.     Plaintiff Spectre Air is a mid-life passenger and freighter aircraft leasing and trading company which provides custom solutions at sensible economics for customers worldwide.

8.     Among other aircraft leasing and trading businesses, Plaintiff Spectre Air has a key line of business in which it purchases aged passenger aircraft airframes (sometimes without engines which Spectre Air then sources), converts them to cargo use, and then sells the completed cargo aircraft to its customers which include key players in the cargo and logistics industry.  This is a highly technical business requiring the expenditure of thousands of hours in preparation for the conversion, the purchase of highly technical conversion kits that are unique to each particular aircraft, and the expenditure of millions of dollars in advance to have the conversion kits installed along with all the other work necessary for such a massive transformation.

9.     Plaintiff Spectre Air is a limited liability company organized and existing under the laws of Texas with an office at 1449 Airpark, Horsehoe Bay, TX 78657.

B.     **Defendant.**

10.    On information and belief, Defendant is an affiliate of Fortress Transportation and Infrastructure Investors LLC, an aviation company principally in the business of leasing and selling of aircraft engines.  On further information and belief, both of those entities are affiliates of Fortress Investment Group, LLC, which is a public company listed on the New York Stock Exchange.

11.     Defendant is a corporation organized and existing under the laws of Ireland, with an office at 1st Floor Cape House, Westend Office Park, Snugborough Road, Blanchardstown, Dublin 15, Ireland.

## JURISDICTION AND VENUE

12.     This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a)(3) because the matter in controversy exceeds $75,000.00 exclusive of interest and costs and is between a citizen of a State and a citizen of a foreign state.

13.     Plaintiff Spectre Air is a Texas limited liability company, whose sole owner is Jetran, LLC ("Jetran"), a Texas limited liability company.  Jetran's owner is Jaffe Group, LLC ("Jaffe Group"), a Texas limited liability company.  Jaffe Group is owned by four trusts, (i) The Morris Douglas Jaffe, Jr. Revocable Trust; (ii) The Morris Douglas Jaffe, III Trust of December 1987; (iii) The Justin Phillip Jaffe Trust of December 1987; and (iv) The Jordan Elliott Jaffe Trust of December 1987.  Morris D. Jaffe, a Texas citizen, is the sole trustee of all four of those trusts. These are traditional trusts because they were established by inter vivo transfer that have vested and contingent beneficiaries with no present ownership interest in trust property and no power over the trusts' administration, disbursements or investments.  *Altruis Grp., LLC v. ProSight Specialty Mgmt. Co., Inc.*, No. 1:21-CV-10757 (MKV), 2023 WL 5151122, at *3 (S.D.N.Y. Aug. 10, 2023).

14.     Defendant is an Irish designated activity company and is a citizen of the Republic of Ireland as it is incorporated in Ireland and, upon information and belief, maintains its principal place of business in Ireland.

15.     Venue is proper in this Court, and this Court has personal jurisdiction over the parties pursuant to an Airframe Sale and Purchase Agreement dated as of June 8, 2022 (the "Purchase Agreement") between Defendant as seller and Plaintiff Spectre Air as purchaser in respect of the subject airframe, in which the parties submitted to the exclusive jurisdiction of any federal courts sitting in New York County, agreed that any legal proceeding relating to the Agreement must be brought in such federal court and waived any objections to venue.  (Exhibit A hereto, ¶ 7.6 (b) and (c), p. 17).

## **FACTS**

### A.     **The Purchase Agreement.**

16.     On or about June 8, 2022, the parties entered into an Airframe Sale and Purchase Agreement whereby Defendant would sell and Plaintiff Spectre Air would purchase five specific used Airbus Model A321-200 airframes (without engines), Manufacturer's Serial Nos. 1153, 1636, 3869, 2610 and 2553, along with all systems, components, appliances, parts, accessories and other equipment installed thereon, and all records, logs, technical data and manuals ("Purchase Agreement").  A true and correct copy of the Purchase Agreement (redacted to conceal confidential financial terms) is attached hereto as Exhibit A.

17.     The Purchase Agreement provides that it is governed by and construed in accordance with the laws of New York.  (Purchase Agreement, § 7.6, p. 17).

18.     In conjunction with the Purchase Agreement, Plaintiff Spectre Air paid a deposit of $675,000 for the five airframes of which $142,500 was allocated as the deposit with respect to MSN 2610, which is the subject of this action.  The purchase price for MSN 2610 is in excess of $2,500,000.

19.     This five-airframe bundle purchase comprised the Plaintiff Spectre Air's launch portfolio of its larger A321 Airbus conversion program in which it was converting A321 Airbus aircraft from passenger to freighter, and thereafter leasing the freighter aircraft to its largest customer, a major international cargo airline. The composition, characteristics and timing of this initial tranche of A321 conversion feedstock aircraft was critical to the successful launch of Plaintiff Spectre Air's strategy to serve this strategically critical and discerning customer.

**B.      The Parties Course of Dealing with Respect to Final Delivery Dates and Closings.**

20.     The Purchase Agreement contains a Final Delivery Date for each airframe, which the Agreement provides may be changed to such later date as may be agreed by the parties in writing.  The sale of all four of the airframes sold to Spectre closed *after* the Final Delivery Dates provided in the Purchase Agreement.  The parties did not execute a written amendment to the Purchase Agreement extending the Final Delivery Date for any of those closings. Defendant simply waited until after the applicable Final Delivery Dates before providing to Plaintiff Spectre Air the necessary aircraft documentation to begin the pre-closing process, and the parties proceeded amicably to closing delivery of each of the four airframes after the Final Delivery Dates set forth in Schedule 1 of the Purchase Agreement had passed.

21.     Defendant's behavior in terms of delivery dates on these Airbus A321s was essentially the same on each of the dozen aircraft and engines (Boeing 737-800s, Airbus A321s and CFMI CFM56-7Bs) sold by Defendant to Plaintiff Spectre Air over the past two years.

22.     For instance, the Final Delivery Date in the Purchase Agreement for MSN 1153 and MSN 1636 was June 15, 2022, but the closing and delivery for those airframes did not occur until August 12, 2022.  The Final Delivery Date for MSN 3869 in the Purchase Agreement was July 15, 2022, but the parties did not begin the pre-purchase inspection until August 31, 2022, and the

closing did not occur until December 3, 2022.  The Final Delivery Date in the Purchase Agreement for MSN 2553 was April 15, 2023, but the pre-purchase inspection did not begin until April 20, 2023, and the closing did not occur until July 10, 2023.

**C.    Defendant Requests the Closing of MSN 2610 Be Delayed and Plaintiff Accommodates Defendant's Request.**

23.     As for MSN 2610, the Final Delivery Date pursuant to the Purchase Agreement was January 15, 2023.

24.     In December 2022, Defendant initially contacted Plaintiff Spectre Air and requested that Plaintiff Spectre Air agree to delay the delivery date for MSN 2610 because Aegean Airlines ("Aegean"), who was using MSN 2610 in its passenger operations, requested Defendant to agree to extend the lease.

25.     At the time Defendant made the request, Plaintiff Spectre Air was able to confirm a March 14, 2024 conversion slot with a specialized maintenance, repair and overhaul facility to perform the conversion of MSN 2610 from a passenger to a freighter aircraft.

26.     Plaintiff Spectre Air agreed to accommodate Defendant by extending the closing and delivery of MSN 2610 to the end of the year, so long as the extended closing did not interfere with Plaintiff Spectre Air's ability to meet the March 14 conversion induction deadline.  The parties agreed to delay the delivery date for MSN 2610 until December 2023.  The agreement to change the Final Delivery Date is confirmed in many writings.

**D.    Plaintiff and Defendant Work Toward the December 2023 Closing.**

27.     In preparation for the sale in December, Defendant's representative, Altug Sokeli of Fortress, sent Plaintiff Spectre Air a September 7 e-mail saying that Defendant was in talks with Aegean about the delivery location for MSN 2610 and asking whether Poland or the United

Kingdom would work. A true and correct copy of the September 7, 2023 e-mail is attached hereto as Exhibit B.

28.    Plaintiff Spectre Air and Defendant continued discussions about the delivery location in e-mails dated September 20, October 4, and October 5. A true and correct copy of those e-mails are attached hereto as Exhibit C.

29.    In addition to the airframes subject to the Purchase Agreement, the parties had engaged in purchases and sales of eight (8) other aircraft and aircraft engines and had essentially developed a system for the transfer and review of the aircraft and engine records in advance of the delivery date. This system included weekly calls to discuss various technical issues.

30.    In early September 2023, Plaintiff Spectre Air and Defendant began what is termed in the industry a Pre-Purchase Inspection technical review ("PPI Technical Review") with respect to MSN 2610. A PPI Technical Review is a pre-purchase inspection that consists of a comprehensive review of an aircraft's condition, records and merchantability, the first part of which consists of a detailed review of the aircraft's records and related paperwork including items such as the logbooks, airworthiness directive compliance and other important documents.

31.    With respect to MSN 2610, Defendant initiated the PPI Technical Review by sending out a Microsoft Teams meeting invitation to Plaintiff Spectre Air's technical team on September 14, 2023, for the PPI Technical Review.

32.    Representatives of Plaintiff Spectre Air and Defendant held a technical review call on September 14, 2023, to discuss Defendant's provision of MSN 2610's aircraft records to Plaintiff Spectre Air for review and delivery issues.

33.     On September 20, 2023, Mr. Ken Tackett of Plaintiff Spectre Air sent an e-mail to Defendant confirming that the "PPI for the subject aircraft and the records review is underway." *See* Exhibit C hereto, p. 2.

34.     As a follow up to the technical review call, on September 22, 2023, Ken Tackett of Spectre Air provided a Master Audit Spreadsheet for MSN 2610 to Alexandros Panou, a records and technical services representative for Defendant, to track information to be disclosed regarding MSN 2610 with respect to its upcoming sale.  A true and correct copy of the September 22, 2023 e-mail is attached hereto as Exhibit D (bottom of page 1 and page 2).

35.     On September 25, 2023, Mr. Panou of Defendant responded and requested that Plaintiff Spectre Air provide access to Kostas Drizis of Meton-Skies who would be assisting Defendant on the sale of MSN 2610.   Notably, Mr. Panou entitled the subject of his e-mail -- "**MSN 2610 – Sale to Spectre**." (emphasis added).  A true and correct copy of the September 25, 2023 e-mail is attached hereto as Exhibit D.

36.     On September 26, 2023, Mr. Panou confirmed in writing that everything was on track for the December closing and that Defendant was uploading documents for Plaintiff Spectre Air's review and noting the following about records review and the delivery of MSN 2610:

> **The redelivery process for Aegean is at it's start and expected to be finalized in December**.  We will be receiving records til that time, but we can prioritize based on your requirements wherever possible.
>
> We will be updating you regularly via emails and the OIL [Open Items List, a team-use Excel workbook containing critical items requiring documentation or other resolution mainly by Defendant].

A true and correct copy of the September 26, 2023 e-mail is attached hereto as Exhibit E (top of page 2) (emphasis added).

37.    On September 28, 2023, Navin Kumar, a member of Plaintiff Spectre Air's technical team, e-mailed Mr. Panou confirming Plaintiff Spectre Air's understanding that "the aircraft redelivery [of MSN 2610] will be completed by December," and requesting certain logs and records for MSN 2610 be sent quicker:

Hi Alex, Thanks for providing the access again.

Our team is reviewing historical records which are available in the Box. **While we understand that the aircraft redelivery [from Aegean to Defendant] will be completed by December,** we kindly request you to share the most recent draft status of AD/SB/STC/LLPS/HT/OCCM at your earliest convenience.

A true and correct copy of the September 28, 2023 e-mail is attached hereto as Exhibit E (bottom of first page) (emphasis added).

38.    On September 28, 2023, Mr. Panou of Defendant wrote to Plaintiff Spectre Air confirming that he was providing additional records for review and again confirming everything was on track for the December delivery as Aegean was scheduled to cease operating MSN 2610 in mid-November:

Hello dear Navin,

Please find attached zipped folder with the available initial Statuses from Aegean. Kindly note **the aircraft is still flying (till mid-November) and the above is being reviewed.**

Let me know if you have properly received the attachment, due to size.

Exhibit E hereto, p. 1 (emphasis added).

39.    Plaintiff Spectre Air and Defendant continued exchanging e-mails about the technical review from September 26 through October 17, 2023. True and correct copies of those e-mail exchanges are attached hereto as Exhibit F.

40.     During that time, the parties did extensive work on the technical review, the progress of which they documented on the Master Audit Spreadsheet.  A true and correct copy of the last version of the Master Audit Spreadsheet is attached hereto as Exhibit G.

41.     In the last e-mail from October 17, 2023, Mr. Panou confirmed that there were "No additional documents to share at this point but will let you know as soon as we do.  Best regards, Alexandros Panou."  Plaintiff's Mr. Kumar responds, "Thank you, Alex.  We'll be on standby to receive any additional documents as they become available."  True and correct copies of that e-mail exchange is on the first page of Exhibit F.

42.     During these discussions, Defendant never suggested that it was not obligated to sell MSN 2610 to Plaintiff Spectre Air.  These emails are writings confirming the parties' agreement to a Final Delivery Date later than January 15, 2023.

43.     After October 17, 2023, Defendant did not provide additional records for MSN 2610.

**E.     Defendant Indicates It Wants Out of the Purchase Agreement.**

44.     In a series of calls in early November 2023, Defendant indicated that it would prefer not to close because it had the opportunity to extend the current lease with Aegean on favorable terms, and Defendant sought Plaintiff Spectre Air's agreement on a price to exit the Purchase Agreement.

45.     The first call was on November 8, 2023.  On that call, Stacy Kuperus, Chief Portfolio Officer of Defendant, asked Kevin Casey, President of Plaintiff Spectre Air, whether Plaintiff had plans for MSN 2610 after the purchase.  Mr. Casey responded that it did, it was going to be converted into a freighter aircraft and that arrangements for the conversion had already been made.

46.    The second call occurred on November 9, 2023 and was again between Ms. Kuperus and Mr. Casey.  On this call, Defendant's Ms. Kuperus stated that Aegean wanted to extend the lease for MSN 2610 for several years, and asked again if Plaintiff Spectre Air was firm on purchasing MSN 2610.  Again, Mr. Casey responded that Plaintiff was firm on the purchase, and again emphasized that Plaintiff had detailed plans and had made large expenditures and contractual commitments toward the conversion process.

47.    The third call was on November 11 and was again between Ms. Kuperus and Mr. Casey.  On this call, Ms. Kuperus of Defendant asked whether there was some "walk away" figure for which Plaintiff Spectre Air would agree not to proceed with the closing which would allow Defendant to extend the lease with Aegean.  For the third time, Mr. Casey confirmed that Plaintiff Spectre Air was fully obligated with the conversion of the aircraft including contractual obligations with the companies engaging in the conversion (321 Precision Conversions, LLC ("Precision Conversions") & HAECO Xaimen), Plaintiff Spectre Air had made arrangements for related maintenance and paint work on MSN 2610, and that MSN 2610 along with its sister aircraft, MSN 2553, were a critical component of a significant end-customer project.

48.    In short, Plaintiff Spectre Air repeatedly rejected Defendant's attempts to "buy" its way out of the purchase of MSN 2610, and Plaintiff Spectre Air repeatedly confirmed how important MSN 2610 was to Plaintiff Spectre Air's business and business reputation.

**F.    Defendant's Purported and Wrongful Termination.**

49.    On November 30, 2023, Defendant, without any warning, sent a notice purporting to "terminate" the Purchase Agreement ("Purported Termination Letter").  The reason for the purported termination was that "the sale and purchase of the Airframe has not taken place by the applicable Final Delivery Date, January 15, 2023."  The notice provided no other explanation.  The

letter concluded that if Plaintiff Spectre Air had any questions "please do not hesitate to contact the Seller." A true and correct copy of the November 30, 2023 notice is attached hereto as Exhibit H.

50.   Immediately upon receiving this letter, Plaintiff Spectre Air's Kevin Casey placed two phone calls, one to Ms. Kuperos and another to Mr. David Moreno, but received no answer.

51.   On the morning of Friday December 1, 2023, Mr. Casey received a text from Mr. Moreno stating "Kevin – I just landed from a flight from the Middle East. Are you available today for a call?" Mr. Casey responded "Morning David, welcome home. Yes. Whenever you have the energy." Later that afternoon I spoke with Mr. Moreno of Defendant who refused to discuss the termination notice except to say, "We won't be able to sell you the airframe."

52.   On December 1, 2023, Plaintiff Spectre Air sent a follow up e-mail further protesting the purported termination. Plaintiff Spectre Air noted that the termination was wrongful for an additional reason, Defendant was not in compliance with its obligations at the time of the purported termination, and as such, it had no right to invoke any termination right. The Purchase Agreement only permitted termination by a party if they were not "otherwise in breach of this Agreement." (Exhibit A hereto, ¶ 5.2, p. 11). Given our relationship with the Defendant, we waited to see if Defendant would change course and comply with its contractual obligations, after which, we started the process of working toward retaining counsel in New York for this matter. A true and correct copy of the December 1, 2023 e-mail is attached hereto as Exhibit I.

**G.    MSN 2610 Is a Unique Asset That Cannot Be Replaced.**

53.   MSN 2610 is incredibly rare in the extent to which it is uniquely suited for freighter conversion and subsequent freighter use. Each Airbus A321-200 aircraft is built to particular specifications. A321-200s are offered in approximately 15 different variants of weight. MSN

2610's weight variant and Maximum Take Off Weight (MTOW) rating gives it among the highest cargo carrying capabilities of an A321 aircraft, making it particularly desirable for conversion and subsequent freighter use. This is just one of many characteristics that make MSN 2610 unique among the very few A321-200s on the market.

54.     Further, each specific Airbus A321-200 aircraft is built for one type of engine and cannot be interchanged with another engine type.  Two types of engine models exist that are suitable for installation on Airbus A321-200 airframes: CFM International (CFM56-5B) and International Aero Engines (V2500).  Operators gain operational synergies from using engines of the same manufacturer and type, with reduced maintenance program costs, training for pilots, crew and maintenance, and consistent spare parts supply.  The engines installed on MSN 2610 are IAE V2500.  These are the engines required by Plaintiff Spectre Air for its end-customer's fleet.  There are currently no known suitable Airbus A321-200 aircraft on the market with IAE V2500 engines.

55.     MSN 2610 is also unique because Plaintiff Spectre Air has already purchased it sister-ship from Defendant as part of the five-aircraft transaction under the Purchase Agreement. Sister-ships are aircraft with near-identicality to another aircraft.  Operators desire sister-ships for spare parts commonality and maintenance training commonality, the ability to swap parts between aircraft, and because they are equipped with the same avionics and other operating features, so they require less crew and maintenance training.  A comparison of the technical attributes of the two aircraft is attached hereto as Exhibit J.  The sister ship, MSN 2553, is about to begin the conversion process.

56.     MSN 2610 was manufactured in 2005 which makes it an especially good age for conversion to a freighter.  Similarly, it has low hours and cycles (a takeoff and landing is a cycle) for the major overhaul maintenance.  Aircrafts require standard maintenance depending upon the

hours and cycles of use.  One of the heaviest maintenance checks, the 12Y HMV Check, is a very expensive and time-consuming process.  However, because of where MSN 2610 is in its maintenance cycle, that heavy check is not required at this time.

57.     MSN 2610 also does not have expanded fuel tanks.  A321s with expanded fuel tanks are currently not compatible for conversion to freighters.

58.     MSN 2610 also does not have blended winglets, a vertical projection on the tip of an aircraft wing for reducing drag.  Aircraft with such winglets require special and expensive changes when undergoing a freighter conversion.

59.     MSN 2610 was also recently used in Europe by an operator governed by EASA, which is the European authority for aviation safety. That makes it more desirable for conversion than an aircraft coming from a non-FAA or non-EASA territory for safety and maintenance concerns, particularly for Plaintiff Spectre Air's Europe-based intended customer.

60.     In addition, the market for passenger aircraft is unusually strong due to historically high levels of consumer demand for commercial air travel and industry issues including reduced Airbus and Boeing production rates and next gen (CFMI Leap & PW1100 GTF) engine reliability issues driving retention of A320/A321-CEO and B737NG aircraft for the next few years.  As a result, aircraft lessors can currently command very favorable lease rates even for older passenger aircraft.  As such, aircraft owners that would normally be receptive to an offer to purchase an older passenger aircraft, have no interest because they can still command favorable lease rates.

**H.     Plaintiff Spectre Air's Commitments with Respect to MSN 2610.**

61.     In reliance on the Purchase Agreement, Plaintiff Spectre Air purchased engines for MSN 2610 as well as the other airframes purchased from Defendant.

62.     For MSN 2610, Plaintiff Spectre Air purchased Engine Serial No. V11553 for $5,250,000 and Engine Serial No. V12037 for $3,650,000.   Defendant knew the enormous expenditures that Plaintiff Spectre Air made in reliance on its purchase of MSN 2610.

63.     Plaintiff Spectre Air would not have purchased these engines but for the purchase of MSN 2610.

64.     In reliance on the Purchase Agreement, Plaintiff Spectre Air's wholly-owned subsidiary, Spectre Cargo Solutions, LLC ("Spectre Cargo"), entered into an A321 Conversion Agreement with Precision Conversions on June 17, 2022 ("A321 Conversion Agreement").

65.     To convert an Airbus A321-200 aircraft from passenger to freighter requires the purchase of a conversion kit, which includes all of the necessary components, parts, equipment, and materials that are specifically designed, fitted, and sized for installation on a particular aircraft.

66.     The characteristics of each aircraft to be modified were taken into consideration during the design and approval, and as well during the aircraft-specific adaptation engineering and manufacturing of the applicable conversion kit.   The conversion includes extensive structural modifications, including inspections and tests to ensure the aircraft is compatible, airworthy and ready for conversion, stripping the cabin to remove all items such as seats, galley monuments, lavatories, overhead bins, and revising the aircraft fire detection systems, ventilation, hydraulics, electronics, illumination, smoke detention, air condition, temperature control and more.

67.     Pursuant to the A321 Conversion Agreement, Spectre Cargo Solutions is currently obligated to provide an A321 Airbus passenger aircraft to Precision Conversions in March of 2024. MSN 2610 was originally contracted for conversion beginning December 2023, with the objective of improving that to July 2023.   Based on Defendant's representation that Aegean was returning the aircraft in early December, MSN 2610's slot was changed to March 2024 at HAECO Xiamen.

68.     Pursuant to the A321 Conversion Agreement, the "Basic Conversion Price" to convert each A321 Aircraft is more than $6,000,000, and that price is subject to escalation as outlined in the Conversion Agreement.  To date, Spectre Cargo has paid $250,000 as a deposit for the work to be performed on MSN 2610.

69.     Each conversion requires the engineering and manufacture of a conversion kit that is unique to the aircraft being converted.  The conversion kit for MSN 2610 has already been ordered and engineering and manufacturing has commenced.  Accordingly, if MSN 2610 is not delivered that conversion kit cannot be used, and whatever parts that can be repurposed for another project would have to be selected.  The costs and damages from the non-use and recycling of parts is not known at this time.

70.     Plaintiff Spectre Air will not be able to purchase a substitute aircraft to meet the March slot.  It is not known what damages Precision Conversions might seek against Plaintiff Spectre Air's wholly-owned subsidiary for missing the slot or the unused conversion kit, but they could be significant, and it could potentially jeopardize the overall contract.

71.     Precision Conversions is one of only two major design change certificate holders in the world that offers Airbus A321 freighter conversion programs.  Due to high demand and limited capacity, the other facility is sold out through 2025.  Failure to present the Aircraft to Precision Conversions within five days of its contracted slot may result in breach of the conversion agreement with Precision Conversions, or at the very least, cause a delay until the Aircraft could be re-slotted into Precision Conversions' rotation.

**I.      Plaintiff Spectre Air Requires Immediate Access to the Historical Records and Logs for MSN 2610.**

72.     The records review process for MSN 2610 will require the receipt and review of thousands of pages of historical and technical records, including back-to-birth bills of sale, activity

logs, manuals, and other documents concerning the airframe and its component parts. The FAA and other civil aviation authorities require operators to maintain hard copy records of service history and serviceability, dating back to the date of manufacture, and documents concerning ownership interests.

73.     Immediate access to the historical records and logs for the Aircraft is required to enable Plaintiff Spectre Air to begin the document review process in time to close in the Aircraft and meet the March 14 conversion deadline. These records include all open items listed on Plaintiff Spectre Air's PPI Master Audit Spreadsheet (*See* Exhibit G (copy of last version of the Master Audit Spreadsheet and Open Items List between the parties)).

74.     With a full team working on the review, and complete cooperation from Defendant in releasing the records to Plaintiff, it will take approximately four to six weeks to complete the records review process for MSN 2610.

75.     Under the Purchase Agreement, Defendant is required to provide Plaintiff Spectre Air with all records associated with the Aircraft. (Ex. A at Section 2.7.) These records are required to be produced within thirty days of the date that the Aircraft is first made available to Plaintiff Spectre Air for inspection, or another date as may be agreed in writing.

76.     The parties began the records review process in September 2023, as part of the inspection process. As discussed above, Defendant made certain limited records available before purporting to terminate the Purchase Agreement.

**J.     Summary.**

77.     No other remotely comparable aircraft exists on the market today. If Plaintiff Spectre Air is unable to close on the purchase of MSN 2610, it would be forced to wait an untold number of months or years to obtain another comparable airframe, lose its conversion slot, lose

the investment made in the conversion kit, engines and other matters preparing for the conversion, and wait before it can start the overhaul and conversion process all over again.

78.     Further, Plaintiff Spectre Air would suffer business and reputational harm from an inability to deliver the converted sistership freighter aircraft to Plaintiff Spectre Air's end-customer, the potential breaches of Plaintiff Spectre Air's wholly-owned subsidiary's contract with Precision Conversions who is conducting the conversions, and the vast difference in Spectre's position within the aircraft market if it is required to start the acquisition and conversion process from scratch today.

## FIRST CAUSE OF ACTION
### (Replevin)

79.     Plaintiff Spectre Air re-alleges and restates the preceding paragraphs as if fully set forth herein.

80.     The Purchase Agreement is a valid, enforceable, and legally binding contract between Plaintiff Spectre Air and Defendant.

81.     The Purchase Agreement includes an accurate description of the subject matter of the contract, MSN 2610.

82.     Plaintiff Spectre Air has fulfilled all of purchaser's duties and obligations under the Purchase Agreement to date, and is ready, willing, and able to perform under the Purchase Agreement including closing on the purchase of MSN 2610.

83.     As established herein, replevin is appropriate as MSN 2610 is unique as well as the existence of other circumstances described above.

84.     As discussed above, the circumstances reasonably indicate that there is no possibility for Plaintiff Spectre Air to cover for the loss of MSN 2610 as it is a unique asset in

addition to the fact that there is a small to non-existent market for mid-life A321s given the current demand for passenger aircraft.

85.     Plaintiff Spectre Air has a superior possessory right to MSN 2610 upon payment of the purchase price.

86.     Plaintiff Spectre Air is entitled to immediate possession of MSN 2610.

87.     Plaintiff Spectre Air respectfully requests that this Court enter judgment granting it the right to replevin with respect to MSN 2610.

**SECOND CAUSE OF ACTION**
**(Specific Performance)**

88.     Plaintiff Spectre Air re-alleges and restates the preceding paragraphs as if fully set forth herein.

89.     The Purchase Agreement is a valid, enforceable, and legally binding contract between and among Spectre Air and Defendant.

90.     The Purchase Agreement includes an accurate description of the subject matter of the contract, MSN 2610.

91.     Plaintiff Spectre Air has fulfilled all of Purchaser's duties and obligations under the Purchase Agreement to date, and is ready, willing, and able to perform under the Purchase Agreement including closing on the purchase of MSN 2610.

92.     Defendant holds legal title to MSN 2610.

93.     It is within Defendant's power to perform under the Purchase Agreement.

94.     On November 30, 2023, Defendant improperly purported to terminate the Purchase Agreement providing no justifiable or legal basis for doing so.

95.     Defendant has indicated that they intend to enter into a long-term lease with Aegean.

96.     Defendant has actually breached the Purchase Agreement and has anticipatorily breached by repudiating their obligations under the Purchase Agreement to provide lien releases, reposition the Aircraft for final delivery, and meet the other obligations and conditions for closing for final delivery, and meet the other obligations and conditions for closing.

97.     For the reasons stated herein, the Aircraft is unique in kind, configuration, and the quality and suitable substitutes are not only unreasonably difficult or inconvenient to procure, they are unobtainable and/or do not exist.

98.     As described herein, Plaintiff Spectre Air has no reasonable prospect of covering if specific performance is denied.

99.     In addition to the above factors making the Aircraft a unique chattel, any alleged monetary remedies that may be proposed by Defendant to the expenditure of Plaintiff Spectre Air's personnel time and resources in connection with MSN 2610 and the transaction, lost opportunity time and resources in connection with the Aircraft and the transaction, lost opportunity costs incurred to date and going forward, harm to business reputation based on the inevitable forced breaches of multiple contracts in the industry, and vast difference in Plaintiff Spectre Air's position within the aircraft market if it is required to and start the acquisition process from scratch today, would be wholly inadequate because they are hypothetical, speculative and/or impossible to calculate.

100.    Plaintiff Spectre Air respectfully requests that this Court enter judgment grating specific performance of the Airframe Purchase Agreement.

### THIRD CAUSE OF ACTION
**(Declaratory Judgment)**

101.    Plaintiff Spectre Air re-alleges and restates the preceding paragraphs as if fully set forth herein.

102.    An actual case or controversy exists with regard to the parties disputed rights and obligations under the Purchase Agreement.

103.    Plaintiff Spectre Air respectfully requests that the Court enter a judgment declaring that the Purchase Agreement was not terminated by Defendant's Purported Termination Letter and declaring that Defendants are obligated to sell MSN 2610 to Plaintiff Spectre Air and must promptly move forward with the closing.

## FOURTH CAUSE OF ACTION
### (Permanent Injunction)

104.    Plaintiff Spectre Air re-alleges and restates the preceding paragraphs as if fully set forth herein.

105.    Plaintiff Spectre Air seeks a permanent injunction preventing Defendant from leasing or selling the Aircraft to any third party other than Plaintiff, directing Defendant to sell MSN 2610 to Plaintiff Spectre Air and to immediately schedule and comply with their obligations to close the transaction in accordance with the Purchase Agreement.

106.    Plaintiff Spectre Air is likely to prevail on the merits because it has satisfied all of its obligations under the Purchase Agreement and Defendant has an exclusive contractual right under the Purchase Agreement to purchase MSN 2610.  For the reasons stated in Plaintiff Spectre Air's Memorandum of Law in Support of its contemporaneously filed Motion for a Temporary Restraining Order and Preliminary Injunction, Plaintiff Spectre Air is likely to succeed on the merits of it claims for specific performance, the imposition of a constructive trust, and declaratory judgment or, in the alternative for breach of contract.

107.    Plaintiff Spectre Air is likely to suffer irreparable harm if the injunction is not granted because, as set forth in detail herein, MSN 2610 is unique chattel and any alleged monetary remedies proposed by Defendant related to the expenditure of Plaintiff Spectre Air's personnel

time and resources in connection with MSN 2610, lost opportunity costs, harm in reputation based on the inestimable forced breaches of multiple contracts in the industry, and vast difference in Plaintiff Spectre Air's position within the aircraft market if it is required to start the acquisition process from scratch today, would be wholly inadequate because they are hypothetical, speculative, and/or impossible to calculate.

108.    The balance of the equities weighs heavily in favor of Plaintiff Spectre Air because it has acted in good faith during this transaction, satisfied all of its obligations to date under the Purchase Agreement, and provided benefits to Defendant far in excess of anything that Plaintiff Spectre Air was contractually obligated to do under the Purchase Agreement as set forth in detail herein.

109.    The public interest would not be disserved by the issuance of an injunction because, among other things, the public has a clear interest in ensuring contracting parties satisfy their agreed-to obligations.  There is no public benefit to be gained by permitting Defendant to sell or lease MSN 2610 to a third party in violation of the Purchase Agreement.

110.    Accordingly, Plaintiff Spectre Air requests that the Court enter a permanent injunction restraining and enjoining Defendant, and each of their respective owners, principals, officers, directors, managers, employees, affiliates, subsidiaries, representatives, agents (including without limitation escrow agents), servants, attorneys, pilots, flight crew members, aircraft managers, aviation vendors, and service providers; and all those acting in concert or participation with any of the foregoing who receive notice of this Order (collectively with Defendant, the "Restrained Parties"), from directly or indirectly selling MSN 2610 to anyone other than Plaintiff Spectre Air; directing Defendant to sell MSN 2610 to Plaintiff Spectre Air and to promptly proceed

with the performance of Defendants' closing obligations under the terms of the Purchase Agreement.

**FIFTH CAUSE OF ACTION**
**(Constructive Trust/Unjust Enrichment)**

111.     Plaintiff Spectre Air re-alleges and restates the preceding paragraphs as if fully set forth herein.

112.     As described herein, Defendant's Purported Termination was wrongful and of no effect, and MSN 2610 should be sold to Plaintiff Spectre Air.

113.     To the extent Defendant is continuing to receive lease payments from Aegean or otherwise with respect to MSN 2610, it has no right to receive those payments, as MSN 2610 rightfully belongs to Plaintiff Spectre Air.

114.     Under the circumstances, Defendant would be unjustly enriched if it were permitted to retain the lease payments as well as MSN 2610.

115.     Accordingly, equity and good conscience demand that any lease payments received by Defendant after January 1, 2024, be put into a constructive trust or the Court's registry while the Court determines the issues in this case as any lease proceeds belong to the true owner of MSN 2610, which is Plaintiff Spectre Air.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Spectre Air respectfully requests that this Court:

A.     Grant a judgment in favor of Plaintiff Spectre Air against Defendant on the First, Second, Third, Fourth and Fifth Causes of Action in an amount to be determined at trial, together with pre- and post-judgment interest thereon;

B.     Grant Plaintiff Spectre Air replevin and order Defendant to close the sale of MSN 2610 to Plaintiff Spectre Air;

24

C.        Declare that the Purchase Agreement was not terminated by Defendant's Purported Termination Letter and declaring that Defendant is obligated to sell the Aircraft to Plaintiff Spectre Air and must promptly move forward with the closing;

D.        Issue a temporary restraining order and preliminary injunction pending resolution of Plaintiff Spectre Air's claims in this action as requested in Plaintiff Spectre Air's contemporaneously filed Motion for a Temporary Restraining Order and Preliminary Injunction;

E.        Issue a permanent injunction prohibiting the sale of the Aircraft to any third party other than Plaintiff Spectre Air, and directing Defendant to sell the Aircraft to Plaintiff Spectre Air and promptly comply with all of Seller's closing obligations under the Purchase Agreement;

F.        Grant a constructive trust for the benefit of Plaintiff Spectre Air or order Defendant to pay any proceeds with respect to the Aircraft received by Defendant after January 1, 2024 into the registry of the Court until this Court determines the true owner of MSN 2610; and

G.        Grant Plaintiff Spectre Air such other and further relief as the Court deems just.

Dated: December 17, 2023

                                    SMITH, GAMBRELL & RUSSELL, LLP

                                    By:       /s/ Edward J. Heppt
                                          John G. McCarthy
                                          Jason S. Bell (*pro hac vice* pending)
                                          Edward J. Heppt

                                    1301 Avenue of the Americas, 21st Floor
                                    New York, New York 10019
                                    Tel: (212) 907-9700
                                    jmccarthy@sgrlaw.com
                                    eheppt@sgrlaw.com
                                    jbell@sgrlaw.com
                                    *Attorneys for Plaintiff*

## **VERIFICATION**

Kevin Casey, pursuant to Title 28, United States Code, Section 1746, hereby declares under the penalty of perjury that he is the President of Plaintiff Spectre Air Capital, LLC; that he has read the foregoing Verified Complaint and knows the contents thereof; that the same is true to the best of his knowledge, information and belief; and the sources of his information and the grounds of his belief are his personal knowledge and involvement, conversations with other representatives of Plaintiff Spectre Air Capital, LLC, and review of relevant documents.

Executed on December 17, 2023.

_____
Kevin Casey