UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SPECTRE AIR CAPITAL, LLC,

                Plaintiff,

        -v.-

WWTAI AIROPCO II DAC,

                Defendant.

---

23 Civ. 10929 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

This dispute concerns the sale of an Airbus A321 airframe (the "Airframe") pursuant to an Airframe Sale and Purchase Agreement (the "Purchase Agreement") between Plaintiff Spectre Air Capital, LCC ("Spectre Air" or "Plaintiff") and Defendant WWTAI AirOpCo II DAC ("AirOpCo" or "Defendant"). Subject to the terms of the Purchase Agreement, Defendant agreed to sell the Airframe, a used passenger aircraft, to Plaintiff. Once purchased, Plaintiff planned — through its affiliates and a third-party conversion company — to convert the Airframe into a cargo aircraft and lease it to a cargo airline.

Shortly before the Airframe's scheduled delivery date, however, Defendant sought to delay the Airframe's sale to Plaintiff. In lieu of the sale, Defendant wanted to extend its lease of the Airframe to Aegean Airlines ("Aegean"), which was then operating (and continues to operate) the Airframe as a passenger aircraft. Plaintiff, which would be disadvantaged by a lease extension to Aegean, objected to the delay and insisted on proceeding with the

sale.  Thereafter, on November 30, 2023, Defendant terminated the Purchase Agreement and, unbeknownst to Plaintiff, entered into a six-year lease of the Airframe with Aegean.

Three weeks after Defendant's termination of the Purchase Agreement, Plaintiff filed this action, arguing that Defendant's termination of the Agreement was invalid, and seeking injunctive relief restraining Defendant from further leasing or selling the Airframe.  After a hearing, the Court granted Plaintiff's request and enjoined Defendant from further leasing or selling the Airframe pending further order of the Court.  At Plaintiff's request, the Court then scheduled a consolidated preliminary injunction hearing and trial on the merits, and did so on an expedited basis in order to meet an airframe conversion slot in the summer of 2024.

In advance of trial, Defendant now brings a motion to dismiss Plaintiff's Complaint on several grounds, including lack of standing, failure to join necessary parties, and failure to state a claim.  For the reasons that follow, the Court grants in part and denies in part Defendant's motion.

## BACKGROUND[1]

### A.   Factual Background

#### 1.   The Parties and the Purchase Agreement

Plaintiff Spectre Air describes itself as "a mid-life passenger and freighter aircraft leasing and trading company which provides custom solutions at

---

[1]   This Opinion draws its facts from the Complaint ("Compl." (Dkt. #1)), the well-pleaded allegations of which are taken as true for purposes of this Opinion.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  The Court also relies, as appropriate, on the parties' Purchase Agreement, attached as Exhibit A to the Complaint ("Agmt." (Dkt. #1-1)),

sensible economics for customers worldwide." (Compl. ¶ 8). Relevant to the instant dispute, one of Plaintiff's lines of business involves purchasing aged passenger aircraft airframes, converting them to cargo use, and selling the completed cargo aircraft to customers, including key players in the cargo and logistics industry. (*Id.*). According to Plaintiff, this is a highly technical business requiring the outlay of millions of dollars up front for, among other things, the purchase of specialized conversion kits that are unique to each particular aircraft, the installation of those conversion kits, and the completion of thousands of hours of other preparatory work — all to facilitate the transformation of a single aircraft. (*Id.*).

Defendant AirOpCo is an affiliate of Fortress Transportation and Infrastructure Investors LLC, an aviation company principally in the business of leasing and selling aircraft engines and airframes. (Compl. ¶¶ 10, 16).

On or about June 8, 2022, the parties entered into the Purchase Agreement, pursuant to which Defendant agreed to sell to Plaintiff five used Airbus Model A321-200 airframes (without engines), bearing Manufacturer's Serial Numbers 1153, 1636, 3869, 2610, and 2553, along with all systems, components, appliances, parts, accessories, and other equipment installed

---

which is incorporated by reference in the Complaint. *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference and documents integral to a complaint).

For ease of reference, the Court refers to Defendant's memorandum of law in support of its motion to dismiss as "Def. Br." (Dkt. #34); to Plaintiff's memorandum of law in opposition to Defendant's motion as "Pl. Opp." (Dkt. #37); and to Defendant's reply memorandum of law as "Def. Reply" (Dkt. #38).

thereon, as well as all associated records, logs, technical data, and manuals. (Compl. ¶ 16). Importantly, for each of the subject airframes, the Purchase Agreement set forth (i) a "Scheduled Delivery Date," *i.e.*, the date on which the sale of the airframe was to occur (Agmt. § 2.4), and (ii) a "Final Delivery Date," *i.e.*, the date by which the airframe had to be delivered to Plaintiff (*id.* § 1.1). The Purchase Agreement further empowered the parties to change any of the Final Delivery Dates "to such later date as may be agreed by the parties in writing." (*Id.* § 1.1 (defining the "Final Delivery Date" as "the applicable date set forth in Schedule 1, or such later date as may be agreed by the parties in writing")).

Either party could terminate the Purchase Agreement upon written notice if, for any reason, the sale and purchase of an airframe had not taken place by the applicable Final Delivery Date, provided that the terminating party was not otherwise in breach of the Agreement:

> 5.2 <u>Termination</u>. If for any reason, completion of the sale and purchase of an Airframe has not taken place by the applicable Final Delivery Date, *then Seller or Buyer (provided such party is not otherwise in breach of this Agreement) may, by written notice to the other party, terminate Seller's obligation to sell and Buyer's obligation to purchase the Airframe*, whereupon neither Seller nor Buyer will have any further rights, obligations or liabilities with respect to such Airframe (other than any accrued rights, obligations and liabilities under any of Section 5.4 (Distribution of Deposit Following Termination), Section 6 (Representations and Warranties), Section 7.4 (Brokers' Commissions) or Section 7.11 (Expense)) and Section 7.12 (Confidentiality) of this Agreement.

(Agmt. § 5.2 (emphasis added)).

4

## 2.       The MSN 2610 Airframe and the Delay in Closing

Defendant transferred four of the five agreed-upon airframes to Plaintiff without incident; problems arose, however, when it came to MSN 2610, the Airframe at issue in this litigation.  (Compl. ¶ 3).  The Airframe's Scheduled Delivery Date had been defined as December 31, 2022.  (Agmt., Schedule 1 (shown below)).  Before the sale was to occur, under the terms of the Purchase Agreement, Plaintiff had the right to inspect the Airframe and its records during a thirty-day period "following the date on which the Airframe [was] made available to [Plaintiff's] representatives for inspection, or such other date as the parties [agreed upon] in writing."  (*Id.* § 1.1 (defining "Inspection Deadline")).  Accordingly, as the sale of the Airframe was to occur on December 31, 2022, the Inspection Deadline had to begin no later than November 30, 2022, while the Final Delivery Date for the Airframe was to be January 15, 2023.  (*Id.*).

**SCHEDULE 1**

**AIRFRAME INFORMATION**

| AIRFRAME | DELIVERY LOCATION | PURCHASE PRICE | DEPOSIT | SCHEDULED DELIVERY DATE | FINAL DELIVERY DATE |
|---|---|---|---|---|---|
| 1153 | The facility of ART at Blytheville, AR, USA | ███ | ███ | 30 May, 2022 | 15 June, 2022 |
| 1636 | The facility of AerSale at Goodyear, AZ, USA | ███ | ███ | 30 May, 2022 | 15 June, 2022 |
| 3869 | The facility of AerSale at Goodyear, AZ, USA | ███ | ███ | 30 June, 2022 | 15 July, 2022 |
| 2610 | [TBC] | ███ | $142,500 | 31 December, 2022 | 15 January, 2023 |
| 2553 | [TBC] | ███ | ███ | 31 March, 2023 | 15 April, 2023 |

(*Id.*, Schedule 1).

5

In December 2022, shortly before the Airframe was scheduled to be delivered, Defendant contacted Plaintiff and requested that Plaintiff agree to delay the Final Delivery Date past January 15, 2023, because Aegean — who was using MSN 2610 in its passenger operations — wanted to extend its lease. (Compl. ¶ 24).  Plaintiff asserts that it agreed to accommodate Defendant by extending the closing and delivery of the Airframe until December 2023, approximately one year after the original Final Delivery Date.  (*Id.* ¶ 26).  While the parties never formally amended the Purchase Agreement to reflect a Final Delivery Date later than January 15, 2023, Plaintiff alleges that the parties, in accordance with Section 1.1 of the Agreement, confirmed the extension in writing.  (*Id.*).[2]

After January 15, 2023, the parties continued to prepare for the transfer of the MSN 2610 Airframe.  In early September 2023, Plaintiff and Defendant began what is termed in the industry as a "Pre-Purchase Inspection Technical Review" ("PPI Technical Review") of the Airframe.  (Compl. ¶¶ 30, 31).  The parties continued exchanging e-mails about the PPI Technical Review from September 26 through October 17, 2023.  (*Id.* ¶ 39 & Ex. F).  Plaintiff maintains that, in those communications, Defendant confirmed that (i) Aegean would return the Airframe to Defendant in November 2023 and (ii) the sale to

---

[2]     With respect to the sale of the first four airframes, those sales closed after the Final Delivery Dates provided in the Purchase Agreement.  (Compl. ¶ 20).  The parties did not execute a written amendment to the Purchase Agreement extending the Final Delivery Date for any of those closings.  (*Id.*).  Defendant simply waited until after the applicable Final Delivery Dates had passed before providing to Plaintiff the necessary aircraft documentation to begin the pre-closing process, and the parties proceeded amicably to closing months after the respective Final Delivery Dates had passed.  (*Id.*).

Plaintiff would occur in December 2023.  Excerpts from these emails include

the following references to the sale and delivery of the Airframe:

- "[T]he [Airframe] is still flying (*till mid-November*) and the above is being reviewed."  (*Id.* ¶ 38 & Ex. E (emphasis added)).

- "The redelivery process for Aegean is at [its] start and expected to be *finalized in December*."  (*Id.* ¶ 36 & Ex. E (emphasis added)).

- "While we understand that the [Airframe] *redelivery* [from Aegean to Defendant] *will be completed by December*, we kindly request you to share the most recent draft status of AD/SB/STC/LLPS/HT/OCCM at your earliest convenience."  (*Id.* ¶ 37 & Ex. E (emphases added)).

### 3.  Defendant Indicates an Intent to Further Delay the Closing Date and Subsequently Terminates the Purchase Agreement

In early November 2023, Defendant notified Plaintiff that Aegean wished

to further extend its lease of the Airframe, citing consumer demand for

commercial air travel, which was then at historically high levels (while air cargo

demand, conversely, was down).  (Compl. ¶¶ 44-46, 60).  The parties thereafter

participated in a series of calls, throughout which Defendant pressed Plaintiff

for its "walk away" price, *i.e.*, the price at which Plaintiff would agree to not

proceed with the closing.  (*Id.* ¶ 47).  Plaintiff ultimately refused to agree to any

further extension of time to complete the transaction.  (*Id.*).

In the wake of Plaintiff's refusal to agree to any further delay, on

November 30, 2023, Defendant sent a notice to Plaintiff purporting to

terminate the Purchase Agreement.  (Compl. ¶ 49 & Ex. H).  The reason given

for the termination was that "the sale and purchase of the Airframe ha[d] not

taken place by the applicable Final Delivery Date, January 15, 2023." (*Id.*).  On

December 1, 2023, Plaintiff protested the termination, in part because — in

Plaintiff's view — Defendant was in breach of the Purchase Agreement, and

therefore had no right to invoke any termination provision.  (*Id.* ¶ 52; Agmt.

§ 5.2 (permitting termination by a party if they are not "otherwise in breach of

this Agreement")).

## B.    Procedural Background

Plaintiff initiated this action by filing the Complaint and an

accompanying emergency motion for a temporary restraining order and

preliminary injunction on December 18, 2023.  (Dkt. #1 (Complaint), 10

(motion)).  Because Defendant's termination of the Purchase Agreement had

been improper, Plaintiff argued, Plaintiff was entitled to injunctive relief

restraining Defendant from further leasing or selling the Airframe.  (*See*

*generally* Dkt. #10).  The Court held a conference with the parties that same

day and, during the conference, scheduled a hearing on Plaintiff's application

for a preliminary injunction to occur on December 21, 2023.  (*See*

December 18, 2023 Minute Entry; Dkt. #21 (transcript)).

Following a brief adjournment at the request of the parties, the Court

held a hearing and argument on January 2, 2024, after which the Court

granted Plaintiff's request for a preliminary injunction, and restrained

Defendant from further leasing or selling the Airframe pending further order

from the Court.  (*See* January 2, 2024 Minute Entry).  At the request of

Plaintiff, the Court then set an expedited schedule for the consolidated

preliminary injunction hearing and trial.  Originally, the trial was scheduled to take place from April 29, 2024, to May 3, 2024, based on representations made by Plaintiff's counsel that Plaintiff needed to meet a conversion slot in the summer of 2024.  On March 27, 2024, however Plaintiff filed a letter requesting a continuance of the trial date to August 2024, representing that the maintenance facility contracted to perform the conversion work had additional conversion slots available in "later 2024."  (Dkt. #44).  The Court granted Plaintiff's request.  (Dkt. #46).

Also during the January 2, 2024 conference, Defendant notified the Court of its intent to file a motion to dismiss Plaintiff's claims.  Accordingly, at the Court's direction, on January 4, 2024, the parties submitted a proposed briefing schedule for Defendant's anticipated motion to dismiss (Dkt. #20), which schedule the Court endorsed the next day (Dkt. #23).

Consistent with that briefing schedule, Defendant filed its motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(b)(7) on January 23, 2024.  (Dkt. #33-34).  Following a requested extension in the briefing schedule, Plaintiff filed its opposition to Defendant's motion on February 5, 2024.  (Dkt. #37).  Finally, Defendant filed its reply in further support of its motion on February 12, 2024.  (Dkt. #38).

**DISCUSSION**

A.     **Applicable Law**

1.     **Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(1)**

In discussing the relevant legal standards, the Court considers first its jurisdiction to hear the case. Federal Rule of Civil Procedure 12(b)(1) permits a party to move to dismiss a complaint for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Lyons* v. *Litton Loan Servicing LP*, 158 F. Supp. 3d 211, 218 (S.D.N.Y. 2016) (quoting *Makarova* v. *United States*, 201 F.3d 110, 113 (2d Cir. 2000)).

The Second Circuit has drawn a distinction between two types of Rule 12(b)(1) motions: (i) facial motions and (ii) fact-based motions. *See Carter* v. *HealthPort Technologies, LLC*, 822 F.3d 47, 56-57 (2d Cir. 2016); *see also Katz* v. *Donna Karan Co., L.L.C.*, 872 F.3d 114, 119 (2d Cir. 2017). A facial Rule 12(b)(1) motion is one "based solely on the allegations of the complaint or the complaint and exhibits attached to it." *Carter*, 822 F.3d at 56. A plaintiff opposing such a motion bears "no evidentiary burden." *Id.* Instead, to resolve a facial Rule 12(b)(1) motion, a district court must "determine whether [the complaint and its exhibits] allege[ ] facts that" establish subject matter jurisdiction. *Id.* (quoting *Amidax Trading Grp.* v. *S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam)). And to make that determination, a court must accept the complaint's allegations as true "and draw[ ] all reasonable

inferences in favor of the plaintiff." *Id.* at 57 (internal quotation marks and citation omitted).

"Alternatively, a defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the complaint and its exhibits." *Carter*, 822 F.3d at 57; *see also MMA Consultants 1, Inc.* v. *Rep. of Peru*, 719 F. App'x 47, 49 (2d Cir. 2017) (summary order) (defining fact-based Rule 12(b)(1) motion as one where "the defendant puts forward evidence to challenge the factual contentions underlying the plaintiff's assertion of subject-matter jurisdiction"). "In opposition to such a motion, [a plaintiff] must come forward with evidence of their own to controvert that presented by the defendant, or may instead rely on the allegations in the[ir p]leading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." *Katz*, 872 F.3d at 119 (internal citations and quotations omitted). If a defendant supports his fact-based Rule 12(b)(1) motion with "material and controverted" "extrinsic evidence," a "district court will need to make findings of fact in aid of its decision as to subject matter jurisdiction." *Carter*, 822 F.3d at 57.

A related issue is that of standing. To bring a case or controversy within the subject matter jurisdiction of federal courts, a plaintiff must have standing under Article III of the Constitution, which requires "a 'personal stake' in the outcome 'throughout the life of the lawsuit.'" *Libertarian Party of Erie Cnty.* v. *Cuomo*, 970 F.3d 106, 121 (2d Cir. 2020), *cert. denied sub nom. Libertarian Party* v. *Cuomo*, 141 S. Ct. 2797 (2021) (quoting *Cook* v. *Colgate Univ.*, 992 F.2d

17, 19 (2d Cir. 1993)); see *generally Thole* v. *U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020).  To establish standing, a federal plaintiff must prove (i) an "injury in fact," constituting an "invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical"; (ii) "a causal connection between the injury and the conduct complained of"; and (iii) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan* v. *Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks and citations omitted).

### 2.    Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

Defendant also argues that Plaintiff's claims are inadequately pleaded. Under Rule 12(b)(6), a defendant may seek dismissal of a plaintiff's action for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When considering a motion to dismiss under Rule 12(b)(6), a court must "draw all reasonable inferences in [p]laintiff['s] favor, 'assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief.'"  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  A plaintiff is entitled to relief if the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does

require enough facts to 'nudge [plaintiff's] claims across the line from conceivable to plausible.'" (quoting *Twombly*, 550 U.S. at 570)).  Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

### 3. Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(7)

Finally, Defendant seeks dismissal of the case for failure to join Aegean, which Defendant claims is a necessary party, as a defendant in this action. Even where claims are adequately pleaded, Federal Rule of Civil Procedure 12(b)(7) provides that an action may be dismissed for failure to join an indispensable party under Federal Rule of Civil Procedure 19.  Fed. R. Civ. P. 12(b)(7).  In consequence, before ruling on a Rule 12(b)(7) motion, a court must first determine whether the absent party is a "necessary" party under Rule 19(a).  *See Viacom Int'l, Inc.* v. *Kearney*, 212 F.3d 721, 724 (2d Cir. 2000); *Yusin Brake Corp.* v. *Motorcar Parts of Am., Inc.*, No. 13 Civ. 9223 (DLC), 2014 WL 2560612, at *11 (S.D.N.Y. June 6, 2014).  Rule 19(a) instructs that an absent party must be joined, if feasible, where:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or

13

> otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).

If a party does not qualify as necessary under Rule 19(a), then the court need not decide whether its absence warrants dismissal under Rule 19(b). *Viacom Int'l, Inc.*, 212 F.3d at 724. On the other hand, "[w]here a court makes a threshold determination that a party is 'necessary' under Rule 19(a) and joinder of the absent party is not 'feasible' for jurisdictional or other reasons, the court must then determine whether the party is 'indispensable' under Rule 19(b)." *Yusin Brake Corp.*, 2014 WL 2560612, at *11; *see also Marvel Characters, Inc.* v. *Kirby*, 726 F.3d 119, 131-32 (2d Cir. 2013).

"[A] court should take a flexible approach when deciding what parties need to be present for a just resolution of the suit.*"* *CP Solutions PTE, Ltd.* v. *Gen. Electric Co.*, 553 F.3d 156, 159 (2d Cir. 2009) (per curiam) (internal citation omitted).  Rule 19(b) specifies the factors a court must assess when determining whether "in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). These factors include:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided … (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

*Id.* "[W]hether a person is 'indispensable,' that is, whether a particular lawsuit must be dismissed in the absence of that person, can only be determined in the context of a particular litigation." *Curley* v. *Brignoli, Curley & Roberts Assocs.*, 915 F.2d 81, 90 (2d Cir. 1990) (quoting *Provident Tradesmens Bank & Trust Co.* v. *Patterson*, 390 U.S. 102, 118 (1968)).  If the court concludes that the party is indispensable, then it must dismiss the action under Rule 19(b).  *Viacom Int'l, Inc.*, 212 F.3d at 725.

## B.    Analysis

The Complaint seeks replevin of the Airframe (Count I); specific performance of the Purchase Agreement with respect to the Airframe (Count II); a declaratory judgment, presumably under the federal Declaratory Judgment Act, 28 U.S.C. § 2201, that the Purchase Agreement was "not terminated" (Count III); a permanent injunction prohibiting Defendant from selling or leasing the Airframe to anyone except Plaintiff (Count IV); and a constructive trust to turn over all lease payments made by Aegean to Defendant starting on January 1, 2024 (Count V).  After considering its ability to hear the case in the first instance, the Court proceeds to address the pleading issues raised by Defendant seriatim.

### 1.    Plaintiff Has Standing to Bring This Lawsuit

Focusing first on the Court's jurisdiction, Defendant argues that Plaintiff lacks standing because it is seeking to assert the rights of its affiliate, Spectre Cargo.  (Def. Br. 23-24).  "It is axiomatic that a party to an agreement has standing to sue a counter-party who breaches that agreement, even where

some or all of the benefits of that contract accrue to a third party." *Frontier Commc'ns of New York, Inc.* v. *Int'l Bhd. of Elec. Workers*, No. 07 Civ. 10327 (GEL), 2008 WL 1991096, at *3 (S.D.N.Y. May 6, 2008) (internal quotations and citations omitted); *see also Highland Capital Management, L.P.* v. *Schneider*, No. 02 Civ. 8098 (PKL), 2008 WL 282769, at *19 & n.13 (S.D.N.Y. Jan. 31, 2008) (concluding that party to contract has standing to sue even though third-party beneficiary also has standing to sue); RESTATEMENT (SECOND) OF CONTRACTS § 305(1) (1981) ("A promise in a contract creates a duty in the promisor to the promisee to perform the promise even though he also has a similar duty to an intended beneficiary."). Here, there is no dispute that Plaintiff was a party to the Purchase Agreement and that Defendant entered into the Agreement to sell the Airframe to Plaintiff. Accordingly, Plaintiff has standing to bring this suit.[3]

### 2. The Court Grants in Part and Denies in Part Defendant's Rule 12(b)(6) Motion

#### a. The Court Dismisses Plaintiff's Claim for Replevin

Proceeding next to the adequacy of Plaintiff's pleadings, Defendant begins by advancing a myriad of arguments in support of dismissal of Plaintiff's replevin claim, including, *inter alia*, that Plaintiff cannot sustain an action for replevin based on contractual violations. (Def. Br. 10). The Court agrees with this argument and grants Defendant's motion as to Count I.

---

[3]    The two cases Defendant cites are inapplicable here. *See Clarex Ltd.* v. *Natixis Sec. Am. LLC*, No. 12 Civ. 0722 (PAE), 2012 WL 4849146 (S.D.N.Y. Oct. 12, 2012) (noting that plaintiffs had not been assigned the rights to guaranteed bond payments at issue in the lawsuit at the time the lawsuit was filed); *AEP-PRI Inc.* v. *Galtronics Corp.*, No. 12 Civ. 8981 (PAE), 2013 WL 4400833, at *8 (S.D.N.Y. Aug. 13, 2013) (noting that plaintiff was not a party to the agreement at issue).

The doctrine of replevin governs actions for the recovery of stolen or wrongfully detained property. *Dore* v. *Wormley*, 690 F. Supp. 2d 176, 183 (S.D.N.Y. 2010). However, if "'plaintiff is essentially seeking enforcement of [a] bargain, the action should proceed under a contract theory.'" *Usov* v. *Lazar*, No. 13 Civ. 818 (RWS), 2013 WL 3199652, at *7 (S.D.N.Y. June 25, 2013) (quoting *Sommer* v. *Fed. Signal Corp.*, 79 N.Y.2d 540, 552 (1992) (other citations omitted). Thus, where a plaintiff "does not allege any *independent duty* by [d]efendants outside of [a] purported contract[ ], [p]laintiff fails to adequately state a claim for replevin." *Id.* (emphasis added); *see also Hargrave* v. *Oki Nursery, Inc.*, 636 F.2d 897, 899 (2d Cir. 1980) ("If the only interest at stake is that of holding the defendant to a promise, the courts have said that the plaintiff may not transmogrify the contract claim into one for tort.").

These principles require dismissal of Plaintiff's replevin claim, because here Plaintiff does not allege any independent duty of Defendant outside of its obligations under the Purchase Agreement. (*See* Compl. ¶¶ 79-87). *See Spanierman Gallery PSP* v. *Love*, No. 03 Civ. 3188 (VM), 2003 WL 22480055, at *3 (S.D.N.Y. Oct. 31, 2003) (holding that where plaintiff's replevin claim arose only from allegations that defendants did not return object in violation of a contract, plaintiff failed to allege any distinct duties giving rise to tort liability and replevin claim should be dismissed). Accordingly, Plaintiff fails to adequately state a claim for replevin, and the Court dismisses this claim.

17

### b.   Plaintiff States a Claim for Specific Performance

Defendant next challenges Plaintiff's claim to specific performance on two grounds: (i) that Defendant validly terminated the Purchase Agreement and (ii) that the Airframe is not unique.  This time, Defendant's arguments are less successful, and Count II withstands the challenge.[4]

As a preliminary matter, New York's Uniform Commercial Code (the "UCC") governs this case because the Purchase Agreement involves a "transaction in goods."  *See* UCC §§ 2-102 (codifying that Article 2 of the UCC applies to "transactions in goods"), 2-105 (1) (defining "goods" to include "all things ... which are movable"); *see also Aviation Dev. Co. PLC* v. *C&S Acquisition Corp.*, No. 97 Civ. 9302 (AJP), 1999 WL 46630, *11 (S.D.N.Y. Feb. 2, 1999) (finding that a contract to purchase aircraft "is a contract for the sale of goods, covered by Article 2 of the New York Uniform Commercial Code"); *Coastal Aviation, Inc.* v. *Commander Aircraft Co.*, 937 F. Supp. 1051, 1062-63 (S.D.N.Y. 1996) (applying New York UCC provisions to contract for sale of airplanes).

---

[4]     It is worth noting that New York courts routinely recognize actions for specific performance, particularly in disputes over real property, *see, e.g.*, *Terex Corp.* v. *Bucyrus Int'l, Inc.*, 943 N.Y.S.2d 18, 21 (1st Dep't 2012) (reversing grant of summary judgment on claim for specific performance); *City Ownership* v. *Giambrone*, 772 N.Y.S.2d 870, 870-71 (2d Dep't 2004) (affirming denial of summary judgment on cause of action for specific performance).

While the Court recognizes Plaintiff's standalone claim for specific performance, it construes the claim, in substance, as a claim for specific performance of a contractual obligation (*i.e.*, a claim for breach of contract).  *See* RESTATEMENT (SECOND) OF CONTRACTS § 357 ("[S]pecific performance of a contract duty will be granted in the discretion of the court against a party who has committed or is threatening to commit a breach of the duty.").  Here, in order to reach the issue of whether specific performance of the contract is warranted, the Court must necessarily determine if the Defendant validly or invalidly terminated (*i.e.*, whether it breached or did not breach) the Purchase Agreement.

With regards to specific performance, the UCC "seeks to further a more liberal attitude than some courts have shown in connection with the specific performance of contracts of sale." UCC § 2-716, Official Comment 1. Section 2-716 governing a "Buyer's Right to Specific Performance or Replevin" provides: "[i] [s]pecific performance may be decreed where the goods are unique or in other proper circumstances[]; [and] [ii] [t]he decree for specific performance may include such terms and conditions as to payment of the price, damages, or other relief as the court may deem just." UCC § 2-716(1)-(2).

### i.   Plaintiff Has Plausibly Alleged That Defendant Was Not Entitled to Invoke the Termination Provision

Defendant first asserts that Plaintiff fails to state a claim for specific performance under the Purchase Agreement because Defendant was free to terminate the Agreement at any time after the original January 15, 2023 Final Delivery Date. In point of fact, regardless of whether the parties validly agreed to extend the Airframe's Final Delivery Date, Plaintiff has plausibly alleged that Defendant was not entitled to invoke its termination right.

*First* — assuming that the parties *did not* validly agree to extend the Final Delivery Date (*i.e.*, the Final Delivery Date of January 15, 2023) — Plaintiff has plausibly alleged that Defendant was otherwise in breach of the Purchase Agreement, precluding it from exercising its termination right. Under New York law, a district court's "primary objective is to give effect to the intent of the parties as revealed by the language of their agreement." *Delta Air Lines, Inc.* v. *Bombardier, Inc.*, No. 20 Civ. 3025 (GHW), 2021 WL 1163702, at *10

(S.D.N.Y. Mar. 25, 2021) (citation and internal quotes omitted). "A written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Id.* (citation and internal quotations omitted). Here, the termination clause upon which Defendant relies provides that

> [i]f for any reason, completion of the sale and purchase of an Airframe has not taken place by the applicable Final Delivery Date, then Seller or Buyer (*provided such party is not otherwise in breach of this Agreement*) may, by written notice to the other party, terminate Seller's obligation to sell and Buyer's obligation to purchase the Airframe[.]

(Agmt. § 5.2 (emphasis added)). Thus, in accordance with the Purchase Agreement's "plain meaning," a party could only terminate the Purchase Agreement if the sale and purchase of an Airframe had not taken place by the Final Delivery Date *and* "such party was not otherwise in breach." (*Id.*).

Here, Plaintiff plausibly alleges that Defendant was in breach of the Purchase Agreement. The Scheduled Delivery Date — December 31, 2022 — was the date the Airframe was to be sold to Plaintiff. (Agmt., Schedule 1). Pursuant to Section 2.7 of the Purchase Agreement, Plaintiff had the right to conduct a pre-purchase inspection of the Airframe. (*Id.* § 2.7 ("Buyer may … (i) physically inspect each Airframe, and (ii) review all records associated with each such Airframe … to determine … whether the Airframe is satisfactory.")). Under Section 2.7, Plaintiff was to complete the inspection "by the Inspection Deadline" — defined under Section 1.1 as "thirty (30) days following the date on which the Airframe is made available to [Plaintiff] and its representatives for

inspection, or such other date as the parties may agree in writing." (*Id.* §§ 2.7,
1.1). Thus, the delivery of the Airframe for inspection had to occur at least by
November 30, 2022, in order to meet the December 31 closing date (*i.e.*, thirty
days prior to the sale). Because the Airframe was not delivered by that date,
Plaintiff has plausibly alleged that Defendant was in breach of the Purchase
Agreement as of November 30, 2022.[5]

Defendant's argument that Plaintiff "never declared" that Defendant was
in breach until after the termination is unpersuasive. (Def. Reply 5).
Defendant points to no provision in the Agreement requiring Plaintiff to declare
Defendant in breach prior to Defendant's termination of the Agreement.
Moreover, Defendant's observation that the parties had not yet finalized a
delivery location (presumably because the parties had indeed agreed to extend
the Final Delivery Date) (Def. Br. 8-9; Def. Reply 5), while somewhat more
persuasive, still does not relieve Defendant of its obligation to provide Plaintiff
with access to the aircraft records and documentation, including the historical
bill of sale and copies of non-incident statements (Agmt. §§ 2.7, 3.1(c)-(d)), or
its obligation to make the aircraft ready for acceptance before the Final Delivery
Date of January 15, 2023.

*Second* — assuming that the parties *did* validly agree to extend the Final
Delivery Date (*i.e.*, the Final Delivery Date was now in December 2023) —

---

[5]     Further, assuming the Final Delivery Date was January 15, 2023, Defendant would
have been required to make the Airframe available for delivery on or before then.
Plaintiff thus also plausibly alleges that Defendant's failure to deliver the Airframe by
that date constitutes a further breach of the Purchase Agreement.

Defendant was precluded from invoking its termination right because such right was not yet ripe.  After all, Defendant was empowered to terminate the Purchase Agreement if "completion of the sale and purchase of [the] Airframe ha[d] not taken place by the applicable Final Delivery Date."  (Agmt. § 5.2).  Accordingly, if the Final Delivery Date was now in December 2023, Defendant could not have validly invoked its termination right in November 2023.

Defendant claims that any agreement the parties made to extend the Final Delivery Date after the execution of the Purchase Agreement was unenforceable because it was not documented "by a writing executed on behalf of the parties by their authorized representatives."  (Def. Br. 13-15 (citing Agmt. § 7.7)).  However, in the Complaint, Plaintiff recounts a number of emails between the parties indicating that the closing would take place in December 2023.  (*See, e.g.*, Compl. ¶¶ 36 (stating that "[t]he redelivery process for Aegean is at [its] start and expected to be finalized in December"), 37 (stating "the aircraft redelivery [from Aegean to Defendant] will be completed by December")).  While the Court may ultimately conclude that these writings, and any others disclosed in discovery, are insufficient to evince an effective modification of the delivery date, at this stage, Plaintiff has met its pleading burden.[6]

Defendant also takes issue with the fact that none of the writings Plaintiff cites (i) is signed by the parties or (ii) purports to formally amend the

---

[6]     Moreover, the parties' course of conduct for the four other aircraft sold and delivered under the Purchase Agreement — each of which closed after their respective Final Delivery Dates set forth in the Purchase Agreement without a formal written executed amendment — supports Plaintiff's view that the parties validly extended the Final Delivery Date.  (Compl. ¶ 20).

Purchase Agreement.  (Def. Br. 13-14).  But this argument is undermined by the plain language of the Purchase Agreement, which neither requires that the writing be signed, nor requires a formal amendment to the Purchase Agreement for changes to the delivery date.  (*See* Agmt. § 1.1 (stating a later Final Delivery Date "*may be agreed by the parties in writing*")).  And, contrary to Defendant's view, Section 7.7 of the Purchase Agreement does not change this conclusion. Section 7.7 states, in relevant part, that

> [t]his Agreement will constitute the entire agreement between the parties with respect to the transactions contemplated herein, supersede any prior or contemporaneous agreements, whether oral or in writing, between the parties, and *this Agreement will not in any manner be supplemented, amended or modified except by a writing executed on behalf of the parties by their authorized representatives.*

(*Id.* § 7.7 (emphasis added)).  Absent from this clause is any bar on future writings and any requirement that the writings be signed or formally appended to the Agreement.  Section 7.7 merely states that any modification to the Agreement must be in "writing" and "executed on behalf of the parties by their authorized representatives."  *Id.*  And, at this stage of pleading, Plaintiff has plausibly alleged that the parties' emails satisfied these requirements.

### ii.   Plaintiff Has Plausibly Alleged That the Airframe Is Sufficiently Unique

Defendant separately argues that Plaintiff is not entitled to specific performance because, in Defendant's opinion, the Airframe is not unique.  (Def. Br. 15-16).  At this early stage, Plaintiff has provided sufficient evidence establishing that the Airframe "uniquely satisfies plaintiff's particular need,"

23

and that "there is no available aircraft that serves [plaintiff's] needs as well as the Airframe at issue in this case." *Jet Experts, LLC* v. *Asian Pacific Aviation Ltd.*, 602 F. Supp. 3d 636, 641 (S.D.N.Y 2022).  Here, the Complaint contains detailed allegations regarding the Airframe's uniqueness.  (*See, e.g.*, Compl. ¶¶ 53 (stating the Airframe is "rare in the extent to which it is uniquely suited for freighter conversion"), 54 (stating "there are currently no known suitable" aircrafts on the market with the engine Plaintiff requires for its fleet), 55 (stating the Airframe is also unique because Plaintiff already purchased its sister craft from Defendant as part of the five-aircraft transaction under the Purchase Agreement), 60 (alleging that no other comparable aircraft exists on the market today given the unusually strong consumer demand for commercial air travel)).  In sum, construing all factual allegations in Plaintiff's favor, Plaintiff has met its pleading burden, and Defendant's motion to dismiss Count II is denied.

### c. The Court Dismisses Plaintiff's Count for Declaratory Judgment

In a different vein, Defendant argues that Plaintiff's claim for declaratory judgment should be dismissed because, *inter alia*, it is a remedy and not a cause of action.  (Def. Br. 17-18).  This time, the Court agrees.

Plaintiff cannot sustain an independent cause of action for a declaratory judgment.  A declaratory judgment is a remedy, not a cause of action.  *In re Joint Eastern & Southern Dist. Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir. 1993) ("A request for relief in the form of a declaratory judgment does not by itself establish a case or controversy involving an adjudication of rights."); *see also*

*Aetna Life Ins. Co. of Hartford, Conn.* v. *Haworth*, 300 U.S. 227, 240 (1937) (stating that the Declaratory Judgment Act does not provide an independent cause of action); *Blue Angel Realty, Inc.* v. *United States*, No. 20 Civ. 8220 (KPF), 2022 WL 94599, at *14 (S.D.N.Y. Jan. 8, 2022) (noting that "declaratory judgments ... are remedies, not causes of action" (citation and internal quotations omitted)).  Rather, the operation of the Declaratory Judgment Act "is procedural only — to provide a form of relief previously unavailable."  *In re Joint Eastern & Southern Dist. Asbestos Litig.*, 14 F.3d at 731 (citing *Aetna Life Ins. Co.*, 300 U.S. at 240).

Plaintiff's opposition simply argues that Plaintiff is entitled to pursue a declaratory judgment where it has other viable claims.  (Pl. Opp. 17).  Accordingly, Defendant's motion to dismiss Count III is granted, but this ruling should not be construed as a finding that Plaintiff may not seek a declaratory judgment as a remedy for its surviving claims.

### d. The Court Dismisses Plaintiff's Count for Permanent Injunctive Relief

Similarly, Defendant asserts that while Count IV of the Complaint purports to state a claim for permanent injunctive relief, it is more appropriately construed as a remedy.  (Def. Br. 18-19).  For similar reasons to those discussed in the preceding section, the Court dismisses this count as well.

It is well settled that an "injunction is a remedy, not a cause of action, and therefore can issue only on the basis of an independent claim for relief."  *Pitcairn Props., Inc.* v. *LJL 33rd Street Assocs.*, LLC, No. 11 Civ. 7318 (JSR),

2013 WL 705861, at *2 n.1 (S.D.N.Y. Feb. 21, 2013); *see also Aretakis* v. *Caesars Entm't*, No. 16 Civ. 8751 (KPF), 2018 WL 1069450, at *13 (S.D.N.Y. Feb. 23, 2018) ("[I]njunctions are remedies, not causes of action." (internal quotations and citations omitted); *Manrique* v. *State Farm Mut. Auto. Ins. Co.*, No. 21 Civ. 224 (KMK), 2021 WL 5745717, at *8 (S.D.N.Y. Dec. 2, 2021) (same). Thus, even if Plaintiff were correct about the propriety of issuing a permanent injunction in this case as a remedy for Defendant's alleged wrongs, Plaintiff has not pointed to any authority showing that an injunction is, itself, a cause of action. Accordingly, Defendant's motion to dismiss Count IV is granted. Again, however, the Court's ruling does not foreclose Plaintiff's ability to seek a permanent injunction as a remedy for its remaining claims.

### e.   The Court Dismisses Plaintiff's Claim for Unjust Enrichment

Defendant seeks to dismiss Count V of the Complaint — stating a claim for "constructive trust/unjust enrichment" — as duplicative of Plaintiff's claim for specific performance of Defendant's contractual obligations. (Def. Br. 19-21). The Court concludes that this claim is duplicative of Plaintiff's contract claim, and on this basis grants Defendant's motion.

Under New York law, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark-Fitzpatrick, Inc.* v. *Long Island R.R.*, 70 N.Y.2d 382, 388 (2d Dep't 1987). Thus, an unjust enrichment claim cannot stand where a "valid and enforceable" agreement "governed the particular subject matter" of the claim. *Beth Isr. Med.*

26

*Ctr.* v. *Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586-87 (2d Cir. 2006).  Similarly, "where a valid agreement controls the rights and obligations of the parties, an adequate remedy at law typically exists, a constructive trust should not be imposed."  *In re First Cent. Fin. Corp.*, 377 F.3d 209, 215 (2d Cir. 2004); *see also Poplar Lane Farm LLC* v. *Fathers of Our Lady of Mercy*, 449 F. App'x 57, 59 (2d Cir. 2011) (summary order) ("[W]hen a valid agreement governs the subject matter of a dispute ..., claims arising from that dispute are contractual; attempts to repackage them as sounding in ... conversion, ... unjust enrichment, implied and quasi contract ... are generally precluded, unless based on a duty independent of the contract.").

Here, it is undisputed that the Purchase Agreement is a valid and enforceable contract.  Further, the unjust enrichment claim "arises from the same operative facts as [the] plaintiff[']s[ ] contract breach claim."  *Physician Mut. Ins. Co.* v. *Greystone Servicing Corp.*, No. 07 Civ. 10490 (NRB), 2009 WL 855648, at *11 (S.D.N.Y. March 25, 2009) (dismissing constructive trust claim because it "arises from the same operative facts as plaintiffs' contract breach claim").  Plaintiff's claim for specific performance hinges on whether Defendant validly terminated the Purchase Agreement and thus breached its contractual obligations to sell and deliver the Airframe.  (Compl. ¶¶ 88-100).  Likewise, Plaintiff's claim for unjust enrichment rests on whether Defendant's "[p]urported [t]ermination [of the Purchase Agreement] was wrongful," such that Defendant was unjustly enriched when it received lease payments from Aegean pursuant to the lease extension.  (*Id.* ¶¶ 111-115).  *See also Pena* v.

27

*Guzman*, No. 03 Civ. 5130 (SHS), 2004 WL 253331, at *2 (S.D.N.Y. Feb. 11, 2004) ("In order to establish a claim for constructive trust, the plaintiff must make an allegation that is not merely duplicative of the breach of contract claim but instead must allege ... distinct harm or actions giving rise to a[ ] separate claim [for a] constructive trust." (alterations in original) (internal quotation marks omitted)).  Thus, contrary to Plaintiff's conclusory assertion, it is clear here that the "contract covers the dispute at issue."  (Pl. Opp. 20).[7] Accordingly, the Court dismisses Plaintiff's claim for unjust enrichment.  *See Spanierman Gallery, PSP* v. *Love*, No. 03 Civ. 3188 (VM), 2003 WL 22480055, at *4 (S.D.N.Y. Oct. 31, 2003) (dismissing constructive trust claim, noting that under New York law, the "existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter" (citation omitted)).

### 3. The Court Denies Defendant's Motion to Dismiss Pursuant to Rule 12(b)(7)

Finally, Defendant asserts that because the Airframe is "currently on lease ... to Aegean Airlines" — which is not a party to this dispute — Aegean is a necessary and indispensable party to this litigation, and, in turn, the Complaint should be dismissed for Plaintiff's failure to join Aegean as a

---

[7]   Plaintiff's reliance on *Lia* v. *Saporito* is unpersuasive.  909 F. Supp. 2d 149, 167 (E.D.N.Y. 2012), *aff'd*, 541 F. App'x 71 (2d Cir. 2013) (summary order).  (Pl. Opp. 20). While the *Lia* court found that the plaintiff had stated a claim for specific performance as well as a claim for constructive trust, the parties did not raise — and the court did not consider — the issue of duplicity.  *Id.*

defendant.  (Def. Br. 21-23).  Because the Court finds contrariwise, it denies

Defendant's motion.

Under Rule 19(a), a party is necessary if:

> (A)    in that person's absence, the court cannot accord
> complete relief among existing parties; or
>
> (B)    that person claims an interest relating to the
> subject of the action and is so situated that disposing
> of the action in the person's absence may: (i) as a
> practical matter impair or impede the person's ability to
> protect the interest; or (ii) leave an existing party subject
> to a substantial risk of incurring double, multiple, or
> otherwise inconsistent obligations because of the
> interest.

Fed. R. Civ. P. 19(a)(1).  As the Second Circuit elaborated in *MasterCard Int'l*

*Inc.* v. *Visa Int'l Serv. Ass'n, Inc.*,

> [i]t is not enough under Rule 19[(a)(1)(B)(i)] for a third
> party to have an interest, even a very strong interest, in
> the litigation.  Nor is it enough for a third party to be
> adversely affected by the outcome of the litigation.
> Rather, necessary parties under Rule 19[(a)(1)(B)(i)] are
> only those parties whose ability to protect their interests
> would be impaired *because of* that party's absence from
> the litigation.

471 F.3d 377, 387 (2d Cir. 2006) (emphasis in original).

The reasoning of *MasterCard* is instructive here.  In that case, Federation

Internationale de Football Association ("FIFA") had entered into contracts for

exclusive sponsorship rights with both MasterCard International Incorporated

("MasterCard") and Visa International Service Association ("Visa") even though

MasterCard had a right of first refusal to the sponsorship rights.  *Mastercard*,

471 F.3d at 380-81.  MasterCard sought to enjoin FIFA from performing under

its contract with Visa.  *Id.*  Visa argued that it was a necessary party because

its rights under the contract were implicated.  In response to Visa's arguments, the Court held that "while Visa may have an interest that would be impaired by the outcome of this litigation," Visa still did not qualify as a necessary party under Rule 19(a)(1) "because the harm Visa may suffer [wa]s not *caused by* Visa's absence," but rather as a result from FIFA's alleged conduct in "awarding Visa sponsorship rights it could not legally give." *Id.* at 387 (emphasis in original).

So too here.  If Aegean is adversely affected by the outcome of this litigation, it will be because Defendant leased the Airframe to Aegean when Defendant legally could not do so, and not because Aegean is absent from this litigation.  Furthermore, "[e]ven if [Plaintiff] prevails and receives the relief it seeks, that does not render [Aegean's contract with Defendant] invalid.  It means that [Defendant] likely has breached ... that contract, and [Aegean] has the right to sue [Defendant] for that breach." *Mastercard*, 471 F.3d at 386.

In this regard, Defendant's reliance on *Crouse-Hinds Co.* v. *InterNorth, Inc.*, 634 F.2d 690, 700-01 (2d Cir. 1980), is misplaced.  As explained by the *MasterCard* court, *Crouse-Hinds* involved "an actual action to set aside a contract," wherein the absent non-party to the litigation was a party to the contract. *Mastercard*, 471 F.3d at 387.  Here, by contrast, Aegean is not a party to the Purchase Agreement, and Plaintiff is not seeking to set aside Aegean's contract with Defendant. *See id.* ("We would be significantly broadening both Rule 19[(a)(1)(B)(i)] and the principle discussed in *Crouse-Hinds* if we found that because the outcome of this case may impact a separate

30

contract involving a different party, that finding would transform the action into "an action to set aside a lease or a contract" (quoting *Crouse-Hinds*, 634 F.2d at 701)).

Because Aegean is not a necessary party, it is also not an indispensable party. *See MasterCard*, 471 F.3d at 389 ("A party cannot be indispensable unless it is a 'necessary party' under Rule 19(a)." (citation and internal quotations omitted)); *see also Viacom Int'l, Inc.*, 212 F.3d at 724 ("If a party does not qualify as necessary under Rule 19(a), then the court need not decide whether its absence warrants dismissal under Rule 19(b)."); *Jonesfilm* v. *Lion Gate Int'l*, 299 F.3d 134, 139 (2d Cir. 2002) ("A party cannot be indispensable unless it is a 'necessary party' under Rule 19(a)."). In view of the foregoing analysis, the Court declines to dismiss the Complaint on the basis of Plaintiff's failure to join Aegean in the action.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's motion to dismiss Counts I, III, IV, and V of the Complaint, and DENIES Defendant's motion as to Count II. The Clerk of Court is directed to terminate the motion pending at docket entry 33.

The parties are encouraged to focus on the remaining issues of discovery and preparation for trial. The following trial schedule will be in effect: trial is currently set to begin on **August 19, 2024**, at **9:00 a.m.** The parties' Joint Pretrial Order, motions *in limine*, and any pretrial memoranda of law will be due **July 17, 2024**. Any opposition papers will be due **July 31, 2024**. The

Court does not request any reply papers.  The final pretrial conference will be scheduled for **August 7, 2024**, at **11:00 a.m.** in Courtroom 618 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York. Accordingly, the parties' joint letter requesting a conference to discuss proposed scheduling and the trial dates is DENIED as moot.  (Dkt. #52).  The Clerk of Court is directed to terminate the motion pending at docket entry 52.

      SO ORDERED.

Dated:      June 17, 2024
             New York, New York

_____
      KATHERINE POLK FAILLA
      United States District Judge